

**ORDERED in the Southern District of Florida on April 13, 2024.**

**Robert A. Mark, Judge**
**United States Bankruptcy Court**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re:<br><br>AEROTECH MIAMI INC. d/b/a iAero Tech, *et al.*,[1]<br><br>Debtors. | Chapter 11 Cases<br><br>Case No. 23-17503-RAM<br><br>(Jointly Administered) |

**ORDER (I) APPROVING STALKING HORSE APA AND AUTHORIZING THE SALE OF CERTAIN ASSETS OF THE DEBTORS OUTSIDE THE ORDINARY COURSE OF BUSINESS, (II) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS EXCEPT FOR PERMITTED LIENS AND ASSUMED LIABILITIES, AND (III) GRANTING RELATED RELIEF**

**THIS MATTER** came before the Court on April 8, 2024 at 9:30 a.m. (the "Sale Hearing")

and on April 10, 2024 at 3:00 p.m., (the "Continued Sale Hearing")  upon the Debtors' *Expedited*

---

[1] The address of the Debtors is 5200 Northwest 36th Street, Miami, FL 33166.  The last four digits of the Debtors' federal tax identification numbers are: (i) AeroTech Miami Inc. d/b/a iAero Tech (2242); (ii) AeroThrust Delta PBH, LLC (6675); (iii) AeroThrust Holdings Aircraft and Engine Leasing, LLC (4451); (iv) AeroThrust Holdings Leasing, LLC  (0152); (v) iAero 11 Investments LLC (9894); (vi) iAero 11B Investments LLC (6126); (vii) iAero Group Bidco Inc. (3777); (viii) iAero Group Holdco 6 LLC (6980); (ix) iAero Group Intermediate Inc. (4712); (x) iAero Group Parent LLC (0962); (xi) iAero Thrust Engine Test Center, LLC (3908); (xii) iAero Thrust LLC (8261); (xiii) JAM Aerospace Parts, LLC (2331); (xiv) New Swift Air Holdings, L.L.C. (7373); (xv) Swift Air, L.L.C. d/b/a iAero Airways (2506); and (xvi) Swift Air Travel, LLC (3558).

*Motion for Entry of an Order (I)(A) Approving Bidding Procedures for the Sale of the Debtors' Assets, (B) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (C) Approving Assumption and Assignment Procedures and (D) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [ECF No. 138] and the Debtors' *Expedited Motion for Entry of an Order (I) Approving Entry Into Stalking Horse APA and Certain Bid Protections, (II) Modifying Certain Bidding Procedures, and (III) Granting Related Relief* [ECF No. 501] (collectively, the "Sale Motions")[2] filed by the above-captioned, affiliated, debtors and debtors-in-possession (collectively, the "Debtors"), by the authority granted to the Debtors by chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code").  The Sale Motions request the entry of an order (this "Order"): (i) approving that certain *Asset Purchase Agreement*, dated March 11, 2024 (as may be amended or otherwise modified from time to time and including all related instruments, documents, exhibits, schedules, and agreements thereto, collectively, the "Stalking Horse APA"), substantially in the form in the *Notice of Filing Executed Version of Stalking Horse APA* [ECF No. 508] (the "Stalking Horse APA Notice") between and among (a) Swift Air, L.L.C. d/b/a/ iAero Airways (the "Seller") and (b) Eastern 737 Asset Holdings LLC (the "Buyer") authorizing the sale of the Purchased Assets (as more specifically described in **Schedule 1** hereto) outside of the ordinary course of business pursuant to the Stalking Horse APA and this Order (the "Sale"); (ii) authorizing the Sale of the Purchased Assets to the Buyer free and clear of all liens,

---

[2]    Any capitalized term not explicitly defined herein shall have the meaning ascribed to it, as applicable, in (i) First Day Declaration, (ii) the Sale Motions, (iii) the Bidding Procedures Order (as defined herein), (iv) the Bidding Procedures (as defined herein), (v) the Bid Protections Order (as defined herein) or (vi) the Stalking Horse APA (as defined herein).

claims, interests and encumbrances except as expressly set forth in the Stalking Horse APA (such liens, claims, interests and encumbrances, other than, as applicable, the Assumed Liabilities and Permitted Liens, collectively the "Liens and Claims"); and (iii) granting related relief, all as more fully set forth in the Sale Motions; and pursuant to this Court's (i) *Order (I)(A) Approving Bidding Procedures for the Sale of the Debtors' Assets, (B) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (C) Approving Assumption and Assignment Procedures and (D) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [ECF No. 195] (the "Bidding Procedures Order") and (ii) *Order Granting Debtors' Expedited Motion for Entry of an Order (I) Approving Entry into Stalking Horse APA and Certain Bid Protections, (II) Modifying Certain Bidding Procedures, and (III) Granting Related Relief and (IV) Setting a Sale Hearing* [ECF No. 524] (the "Bid Protections Order"), this Court having authorized the applicable Debtor to enter into the Stalking Horse APA pursuant to which the Buyer agreed to serve as the Stalking Horse Bidder with respect to the Purchased Assets, free and clear of the Liens and Claims except as expressly set forth in the Stalking Horse APA, with such sale to be in accordance with the terms and subject to the conditions of the Bidding Procedures Order, the Stalking Horse APA and the Bid Protections Order; and the Bidding Procedures Order and the Bid Protections Order having authorized the Debtors to conduct, and approved the terms and conditions of, an auction, if applicable, as required and as set forth in the Bidding Procedures Order and the Bid Protections Order (the "Auction") to consider higher or otherwise better offers for the Purchased Assets, establishing a date for the Auction, and approving, among other things: (i) certain Bidding Procedures (the "Bidding

Procedures") to be used in connection with the Auction, if applicable; (ii) the form and manner of notice of the Auction and Bidding Procedures; and (iii) the Break-Up Fee and Expense Reimbursement; and this Court having established the date of the Sale Hearing; and *Private Jet Services Group, LLC's Objection to Debtors' Bid Protections Motion* [ECF No. 513] (the "PJS Objection") and the *United States Trustee's Limited Objection to Debtors' Expedited Motion for an Order (I) Approving Entry Into Stalking Horse APA and Certain Bid Protections, (II) Modifying Certain Bidding Procedures and (III) Granting Related Relief (ECF 501)* [ECF No. 519] (together with the PJS Objection, collectively, the "Objections") having been settled, withdrawn or overruled; and this Court having jurisdiction to consider the Sale Motions and the relief requested therein in accordance with 28 U.S.C. §§ 157(b)(2) and 1334; and venue being proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409; and the Sale Motions, the relief requested therein, and the Objections thereto, being a core proceeding in accordance with 28 U.S.C. § 157(b); and the appearance of all interested parties to the Sale Motions and the Objections having been duly noted in the record of the Sale Hearing; and upon the record of the Sale Hearing, and all other pleadings and proceedings in these bankruptcy cases; and this Court having found that the relief requested in the Sale Motions is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Sale and the Sale Motions and opportunity for a hearing on the Sale Motions, including the Sale Notice, were appropriate and no other notice need be provided; and this Court having reviewed the Sale Motions, the Objections, and all related pleadings, and having heard the statements in support of the relief requested in the Sale Motions at the Sale Hearing before this Court; and this Court having determined that the legal and factual bases set forth in the Sale Motions and at the Sale Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court and at the Sale Hearing,

including the testimony of Richard W. Morgner and Kenneth M. Woolley, which was admitted into evidence without objection; and after due deliberation and sufficient cause appearing therefor, does for the reasons stated in the Sale Motions and on the record of the Sale Hearing and Continued Sale Hearing, as well as the findings of fact and conclusions of law made by the Court in its oral ruling announced on April 10, 2024, all of which are expressly incorporated herein in their entirety:

**IT IS HEREBY FOUND, DETERMINED AND CONCLUDED THAT:**

A.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.      To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.      This Court has jurisdiction over this matter and over the property of the Debtors' estates, including the Purchased Assets (as defined in the Stalking Horse APA) to be sold, transferred, or conveyed pursuant to the Stalking Horse APA, pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2).  This Court may enter a final order with respect to the Sale Motions, the Sale, and all related relief, in each case, consistent with Article III of the United States Constitution.  Venue of these bankruptcy cases and the Sale Motions in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D.      This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds

that there is no just reason for delay in the implementation of this Order, and expressly directs entry of this Order as set forth herein and the closing of all Transactions contemplated hereby without regard to any stay or delay in its implementation.

E.      The statutory and rule-based predicates for the relief requested in the Sale Motions and for the approvals and authorizations herein are (i) sections 105, 363, 365, 503 and 507 of the Bankruptcy Code, (ii) Bankruptcy Rules 2002, 6004, 6006, 9006, 9007, 9008, 9014 and 9019 and (iii) Local Rules 2002-1(C)(2) and 6004-1.

F.      Proper, timely, adequate, and sufficient notice of, and a reasonable opportunity to object or otherwise be heard regarding: the Sale Motions, the Auction, the Sale Hearing, and the Transactions contemplated by the Stalking Horse APA, including, without limitation, the Sale of the Purchased Assets free and clear of the Liens and Claims, have been provided in accordance with sections 102(1) and 363(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 9006, 9007, 9008, and 9014, the Local Rules of the Court, the procedural due process requirements of the United States Constitution, in compliance with the Bidding Procedures Order, the Bid Protections Order and in accordance with the Debtors' fiduciary duties.  No other or further notice of, opportunity to object to, or other opportunity to be heard regarding the Sale Motions, the Auction, the Sale Hearing, or of the entry of this Order is necessary or shall be required.

G.      The Debtors gave due and proper notice of the Sale by means of the Certificates of Service, filed on October 12, 2023 [ECF No. 165] and March 13, 2024 [ECF No. 515] reflecting service of the Sale Motions, Stalking Horse APA and other documents on both the master service list and the master mailing list and by notice of this proposed Order, filed on March 25, 2024 [ECF No. 557] reflecting services of this proposed Order on both the master service list, the master mailing list (collectively the "Sale Notice").  The Sale Notice constituted good, sufficient, and

appropriate notice of the Sale under the particular circumstances and no further notice need be given with respect to the proposed Sale. As provided by the Sale Notice, a reasonable opportunity to object or be heard regarding the requested relief has been afforded to all interested persons and entities, including, without limitation, (i) all creditors or their counsel known to the Debtors to assert a lien (including any security interest), claim, right, interest, or encumbrance of record against all or any portion of the Purchased Assets, (ii) the Office of the United States Trustee for the Southern District of Florida, (iii) counsel to the Buyer, (iv) counsel to the Prepetition Secured Lenders, (v) counsel to the DIP Lenders, (vi) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002, (vii) all applicable federal, state and local taxing and regulatory authorities of the Debtors or recording offices or any other governmental authorities that to the Debtors' knowledge, as a result of the sale of the Purchased Assets, may reasonably have claims, contingent or otherwise, in connection with the Debtors' ownership of the Purchased Assets or any known interest in the relief requested in the Sale Motions and (viii) all potential bidders previously identified or otherwise known to the Debtors that heretofore entered into non-disclosure agreements with the Debtors with respect to the potential purchase of the Debtors' businesses and assets. Other parties interested in bidding on the Purchased Assets were provided, pursuant to the Bidding Procedures Order and Bid Protections Order, sufficient information to make an informed judgment on whether to bid on the Purchased Assets.

H.      The Purchased Assets are property of the Debtors' estates and good title thereto is vested in the Debtors' estates. Except as may be otherwise set forth in the Stalking Horse APA, the Debtors are the sole and lawful owners of the Purchased Assets, and no other person has any ownership right, title, or interest therein.

I.      The Debtors, in a reasonable exercise of their business judgment, have demonstrated a sufficient basis and the existence of reasonable, appropriate and compelling circumstances requiring them to enter into the Stalking Horse APA, to transfer the Purchased Assets to the Buyer under sections 363 of the Bankruptcy Code, and such actions are entirely fair and appropriate exercises of the Debtors' reasonable business judgment and in the best interests of the Debtors, their estates and their stakeholders.  The Debtors' boards of managers, boards of directors and Holdco 6 Committees[3], to which such boards' authority to authorize and to approve all restructuring matters has been delegated, have complied with all of their fiduciary duties, and approval of the Sale to the Buyer is a proper exercise of the Debtors' fiduciary duties.

J.      The Debtors, the Buyer, and their respective professionals have complied, in good faith, in all respects with the Bidding Procedures Order and Bid Protections Order, and the bidding process was free of any fraud, collusion, or unfair dealing.  As demonstrated by (i) the testimony and/or other evidence proffered or adduced at the Sale Hearing or submitted by affidavit or declaration at or prior to the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, through marketing efforts and a competitive sale process conducted in accordance with the Bidding Procedures Order and Bid Protections Order, the Debtors (a) afforded all potentially interested investors a full, fair, and reasonable opportunity to qualify as bidders and submit their highest or otherwise best offer to purchase the Purchased Assets, (b) provided all interested investors, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Purchased Assets, and (c) considered any bids submitted on or before the deadline to submit bids as set forth in the Bid Protections Order (the "Final Bid Deadline").

---

[3] As such term is defined in the *Declaration of Kevin Nystrom in Support of Chapter 11 Petitions and First Day Pleadings* [ECF. No. 66] (the "First Day Declaration"). *See* First Day Declaration, ¶ 61.

K.      The Stalking Horse APA is a valid and binding contract between the Debtors and the Buyer.  The Stalking Horse APA was not entered into, and the Sale is not being consummated for the purpose of, hindering, delaying, or defrauding present or future creditors of the Debtors. The Debtors and the Buyer were each represented by separate and independent advisors throughout the negotiation of the Stalking Horse APA.  All payments and other consideration to be made by the Buyer in connection with the Transactions have been disclosed.  Neither the Debtors nor the Buyer are proposing to consummate the Sale fraudulently, for the purpose of statutory or common law fraudulent conveyance or fraudulent transfer claims whether under the Bankruptcy Code, under the laws of the United States, any state, territory, possession thereof, the District of Colombia or otherwise.

L.      (i) The Debtors and their advisors conducted a fair, extensive, and open sale process that complied with the Bidding Procedures, Bidding Procedures Order and Bid Protections Order in all respects; (ii) the sale process and the Bidding Procedures set forth in the Bidding Procedures Order and Bid Protections Order were (a) non-collusive, (b) substantively and procedurally fair to all parties in interest, (c) duly noticed, (d) provided a full, fair, and reasonable opportunity for any potentially interested party to make an offer to purchase the Purchased Assets, and (e) resulted in a fair bidding process; (iii) the process conducted by the Debtors pursuant to the Bidding Procedures obtained the highest or otherwise best value for the Purchased Assets for the Debtors and their estates, and any other transaction would not have yielded as favorable an economic result; (iv) the Buyer has put forth the highest or otherwise best offer for the Purchased Assets pursuant to the terms of the Bidding Procedures Order and Bid Protections Order; (v) the Purchase Price received by the Debtors for the Purchased Assets, after considering all of the relevant facts and

circumstances of the Sale as a whole, is fair; and (vi) the Bidding Procedures obtained the highest or best value for the Purchased Assets for the Debtors and their estates.

M.    The offer of the Buyer, in accordance with the terms and subject to the conditions set forth in the Stalking Horse APA, including the form and total consideration to be realized by the Debtors pursuant to the Stalking Horse APA, (i) is the highest or best offer received by the Debtors and their estates, (ii) is fair and reasonable, (iii) is in the best interests of the Debtors' stakeholders and estates, and (iv) constitutes full and fair consideration and reasonably equivalent value for the Purchased Assets.

N.    The Debtors received no Competing Qualified Bids (other than the Stalking Horse Bid).  As such, the Auction was cancelled and the Debtors identified the bid by the Buyer as the highest or otherwise best offer for the Purchased Assets pursuant to the terms of the Bidding Procedures Order and Bid Protections Order.  The Debtors have provided reasonable and adequate notice of the cancellation of the Auction and of the Buyer being designated the Successful Bidder pursuant to the terms of the Bidding Procedures Order and Bid Protections Order.

O.    As set forth in paragraph E of the *Final Order (I) Authorizing Debtors to (A) Obtain Postpetition Secured Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay and (V) Granting Related Relief* [ECF No. 191] (the "Final DIP Order"), the Debtors have stipulated to the Prepetition Secured Lenders' valid, binding, perfected and enforceable, first priority liens over the Collateral (as defined in the Final DIP Order) that secure the Prepetition Obligations (as defined in the Final DIP Order).

P.    The evidence adduced from Richard W. Morgner and Kenneth M. Woolley at the Sale Hearing established that the Buyer is a purchaser in "good faith," as that term is used in the

10

Bankruptcy Code and relevant decisions and is entitled to the protections of section 363(m) and (n) of the Bankruptcy Code with respect to the Purchased Assets.  The sales process engaged in by the Debtors and the Buyer, including, without limitation, the Auction and the negotiation and execution of the Stalking Horse APA, was in good faith, based upon arm's length bargaining, without collusion or fraud of any kind and was substantively and procedurally fair to all parties in interest in all respects and afforded potential purchasers a full, fair, and reasonable opportunity to make a higher or otherwise better offer for the Purchased Assets.  Neither the Debtors nor the Buyer has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of, or implicate, section 363(n) of the Bankruptcy Code to the Stalking Horse APA or to the consummation of the Sale and transfer of the Purchased Assets to the Buyer.  The Buyer is purchasing the Purchased Assets in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and is, therefore, entitled to the protection of that provision, and otherwise has proceeded in good faith in all respects in connection with this proceeding in that: (i) the Buyer recognized that the Debtors were free to deal with any other party interested in acquiring the Purchased Assets; (ii) the Buyer fully complied with all of the provisions of the Bankruptcy Code, the Bidding Procedures Order, the Bid Protections Order and the Bidding Procedures; (iii) there was no fraud, collusion, or unfair dealing in connection with the bidding process and the sale of the Purchased Assets; (iv) the Buyer has fully disclosed all of its connections with the Debtors, including, pursuant to the *Order Authorizing Discovery Relevant to Sale Motion – Re: 501* [ECF Nos. 527 and 532]; (v) all consideration to be paid or provided to the Debtors by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale have been disclosed; (vi) the Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction; and (vii) the negotiations and

execution of the Stalking Horse APA and any other agreements or instruments related thereto were in good faith and free from any collusion, fraud, or unfair dealing. The protections afforded by Bankruptcy Code section 363(m) are integral to the Sale, and the Buyer would not consummate the Sale without such protections.

Q.      The Debtors have full corporate or other power and authority to execute the Stalking Horse APA (and all other documents contemplated thereby) and to consummate the Transactions contemplated therein, and the sale or transfer of the Purchased Assets has been duly and validly authorized by all necessary corporate or other actions on the part of the Debtors' estates. No consents or approvals, other than as may be expressly provided for in the Stalking Horse APA, are required by the Debtors' estates to consummate such Transactions.

R.      The Debtors have advanced sound business reasons for entering into the Stalking Horse APA and transferring the Purchased Assets, as more fully set forth in the Sale Motions and the Stalking Horse APA and as demonstrated at the Sale Hearing, and it is entirely fair to all parties in interest, and a reasonable exercise by the Debtors of the Debtors' business judgment to transfer the Purchased Assets to the Buyer and to consummate the Transactions contemplated by the Stalking Horse APA with the Buyer. The Sale, the Purchase Price and the form of consideration paid for the Purchased Assets were negotiated in good faith and are entirely fair and the product of good faith negotiations among the parties, including the Debtors, Synovus Bank, as a Prepetition Secured Lender and a DIP Lender ("Synovus") and the Buyer. Notwithstanding any requirement for approval or consent by any person, the transfer of the Purchased Assets to the Buyer under this Stalking Horse APA and this Order represents a legal, valid, and effective transfer of the Purchased Assets to the Buyer, with all right, title, and interest of the Debtors to the Purchased Assets free

12

and clear of any Liens and Claims. The Buyer shall not assume or become liable for any Liens and Claims relating to the Purchased Assets being sold by the Debtors.

S.       Except with respect to any Permitted Liens that the Buyer has agreed to permit to survive the Closing (as defined below) pursuant to the express terms of the Stalking Horse APA, the Liens shall attach to the consideration to be received by the Debtors (if any) in the same priority and subject to the same defenses and avoidability, if any, as before the closing of the Transactions contemplated by the Stalking Horse APA (the "Closing"), and the Buyer would not enter into the Stalking Horse APA to purchase the Purchased Assets or proceed to the Closing were it otherwise.

T.       The transfer of the Purchased Assets to the Buyer free and clear of any Liens and Claims will not result in any undue burden or prejudice to any holders of any Liens, because all such Liens of any kind or nature whatsoever shall attach to the net proceeds (if any) of the sale of the Purchased Assets received by the Debtors in the order of their priority, with the same validity, force, and effect as existed prior to Closing as against the Purchased Assets and subject to any claims and defenses the Debtors or other parties may possess with respect thereto. All persons having Liens of any kind or nature whatsoever against or in any of the Debtors and/or the Purchased Assets shall be forever barred, estopped and permanently enjoined from pursuing or asserting such Liens (subject to the Permitted Liens that the Buyer has agreed to permit to survive the Closing pursuant to the express terms of the Stalking Horse APA) against the Buyer or any of its respective assets, property, successors or assigns, or the Purchased Assets.

U.       The Debtors may sell the Purchased Assets free and clear of any Liens of any kind or nature whatsoever because, in each case, one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied. The holders of Liens who did not object, or who withdrew their objections, to the sale of the Purchased Assets and the Sale Motions are deemed to

13

have consented pursuant to section 363(f)(2) of the Bankruptcy Code.  Except as set forth below, any objections to the Sale Motions have been overruled or resolved.  Those holders of Liens who did object, if any, fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Liens, if any, attach to the proceeds, if any, of the Sale of the Purchased Assets ultimately attributable to the property against or in which they claim or may claim any Liens, with such Liens being subject to treatment as prescribed in an order of this Court, including an order confirming any chapter 11 plan.

V.      The Buyer would not have entered into the Stalking Horse APA and would not consummate the Transactions contemplated thereby, thus adversely affecting the Debtors and their estates and their creditors, (i) if the sale of the Purchased Assets was not free and clear of all Liens and Claims, including, without limitation, any rights, Liens, or Claims based on any successor or transferee liability, or (ii) if Buyer would, or in the future could, be liable for any Liens and Claims related to the Purchased Assets, including, without limitation, any rights, Liens, based on any successor or transferee liability.  The Buyer will not consummate the Transactions unless this Court expressly orders that Buyer, its affiliates, and each of their respective present or contemplated members or shareholders (the "Purchaser Parties") will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff, or otherwise, directly or indirectly, any Liens and Claims related to the Purchased Assets, including rights or claims based on any successor or transferee liability.

W.      Not selling the Purchased Assets free and clear of all Liens and Claims would adversely impact the Debtors' estates, and the sale of Purchased Assets other than as free and clear of all Liens and Claims would be of substantially less value to the Debtors' estates.

14

X.      The sale of the Purchased Assets outside of a plan of reorganization pursuant to the Stalking Horse APA neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a liquidating plan or reorganization of the Debtors.  The Sale does not constitute a *sub rosa* chapter 11 plan.

Y.      The notice and opportunity to object provided to all parties in interest, as set forth in the Bidding Procedures Order, the Bid Protections Order and the Stalking Horse APA, fairly and reasonably protect any rights of any party in interest.

Z.      The Debtors and the Buyer will be acting in good faith, pursuant to section 363(m) of the Bankruptcy Code, in closing the Transactions contemplated by the Stalking Horse APA at any time on or after the entry of this Order and cause has been shown as to why this Order should not be subject to any stay, including, without limitation, as provided by Bankruptcy Rules 6004(h) and 6006(d) and any applicable Local Rule.

AA.     The objections of the United States Trustee, as stated on the record, and the PJS Objection are overruled. The objections of the Committee are withdrawn as memorialized by the modifications to this Order.

BB.     The Transactions contemplated under the Stalking Horse APA do not amount to a consolidation, merger, or *de facto* merger of the Buyer, on the one hand, and the Debtors and/or the Debtors' estates, on the other, there is not substantial continuity between the Buyer or the Purchaser Parties, on the one hand, and the Debtors and/or the Debtors' estates, on the other, there is no continuity of enterprise between the Debtors and/or the Debtors' estates and the Buyer or the Purchaser Parties, neither are the Buyer or the Purchaser Parties an alter ego or a mere continuation of the Debtors or the Debtors' estates, and the Buyer and the Purchaser Parties are not successors to the Debtors or the Debtors' estates.

CC.    The total consideration provided by the Buyer for the Purchased Assets constitutes (a) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (b) entirely fair consideration under the Uniform Fraudulent Conveyance Act, and (c) reasonably equivalent value, entirely fair consideration, and fair value under any other applicable laws, including the laws of the United States, any state, territory or possession, or the District of Columbia, for the Purchased Assets.

DD.    Time is of the essence in consummating the Sale.  In order to maximize the value of the Purchased Assets, it is essential that the sale of the Purchased Assets occur within the time constraints set forth in the Stalking Horse APA.  Accordingly, there is cause to lift the stays contemplated by Bankruptcy Rules 6004 and 6006.

EE.    After the Closing, the Debtors shall have no liability whatsoever with respect to the Assumed Liabilities.  The Buyer and the Purchaser Parties shall have no obligations with respect to any Liens and Claims.

**NOW, THEREFORE, BASED UPON ALL OF THE FOREGOING, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.    The relief requested in the Sale Motions is **GRANTED** as set forth herein and the Stalking Horse APA is approved, in accordance with the terms and subject to the conditions contained herein.

2.    Except as otherwise set forth herein, all objections, responses, reservations of rights, and requests for continuance concerning the Sale Motions, including, without limitation, the Objections, are resolved in accordance with the terms and subject to the conditions of this Order and as set forth in the record of the Sale Hearing.  To the extent any such objection, response, reservation of rights, or request for continuance, including, without limitation, the Objections, was

not otherwise withdrawn, waived, or settled, such are hereby overruled and denied on the merits with prejudice.

3. Notice of the Sale Hearing including as provided by the Sale Notice was fair, equitable, proper, and sufficient under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002, 6003, 6004, and 6006, the Local Rules, the Bidding Procedures Order and the Bid Protections Order and no further notice is required.

4. The Debtors, in transferring the Purchased Assets pursuant to this Order and section 363 of the Bankruptcy Code, are deemed, under section 1107(a) of the Bankruptcy Code, to have all rights and powers to perform all the functions and duties of a trustee serving in a bankruptcy case, and will transfer the property pursuant to this Order.

5. In accordance with to the terms and subject to the conditions of this Order, the sale of the Purchased Assets, the Stalking Horse APA (including all schedules and exhibits affixed thereto), and the Transactions contemplated thereby shall be, and hereby are, authorized and approved in all respects, and shall be enforceable against each of the Parties thereto.

6. The failure specifically to include any particular provisions of the Stalking Horse APA or any of the related documents, ancillary documents, or instruments executed in connection therewith in this Order shall not diminish or impair the effectiveness and force of such provision, document, Stalking Horse APA, or instrument, it being the intent of the Court, the Debtors, and the Buyer, that the Stalking Horse APA and each related document, ancillary document, or instrument be authorized and approved in its entirety with such amendments thereto as may be made by the parties in accordance with the Stalking Horse APA and this Order prior to the Closing Date, and each such provision of the Stalking Horse APA shall be enforceable by or against each of the Parties thereto.

7.      The Stalking Horse APA and any related ancillary document(s), or other instruments may be modified, amended, or supplemented by the parties thereto in accordance with the terms and subject to the conditions thereof without further order of the Court; provided, that any such modification, amendment, or supplement is not material and substantially conforms to, and effectuates, the Stalking Horse APA and any related ancillary documents.

8.      The sale of the Purchased Assets and the consideration provided by the Buyer under the Stalking Horse APA are entirely fair and reasonable, represent the highest or otherwise best offer for the Purchased Assets and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law as the result of a fair bidding process.  The Sale of the Purchased Assets to the Buyer is a legal, valid and effective transfer of the Purchased Assets notwithstanding any requirement for approval or consent of any entity.

9.      The Buyer is hereby granted and is entitled to all the protections provided to a good faith purchaser under section 363(m) of the Bankruptcy Code.

10.      The Debtors and their employees, professional advisors, and agents shall be, and hereby are, authorized and directed to fully assume, perform under, consummate, and implement the transactions contemplated by the Stalking Horse APA together with any and all additional instruments and documents that may be necessary or desirable in connection with implementing and effectuating the transactions contemplated by the Stalking Horse APA, this Order, and/or the sale of the Purchased Assets, including, without limitation, the certificates, deeds, assignments, and other instruments of transfer, and to take all further actions as may reasonably be requested by the Buyer for the purpose of assigning, transferring, granting, conveying, and conferring to the Buyer, or reducing to possession, any or all of the Purchased Assets, or Assumed Liabilities as

18

may be necessary or appropriate to the performance of the obligations of the Debtors' estates in accordance with, or as contemplated by, the Stalking Horse APA, without any further corporate or other action or orders of this Court.

11.    The Debtors and each other person or entity having duties or responsibilities under the Stalking Horse APA, any agreements or instruments related thereto or this Order, and their respective directors, officers, managers, employees, members, agents, representatives, attorneys, and other retained professionals are authorized, empowered, and directed, in accordance with the terms and subject to the conditions contained in the Stalking Horse APA and this Order, to carry out all of the provisions of the Stalking Horse APA and any related agreements or instruments; to issue, execute, deliver, file, and record, as appropriate, the documents evidencing and consummating the Stalking Horse APA and any related agreements or instruments; to take any and all actions contemplated by the Stalking Horse APA, any related agreements or instruments, or this Order; and to issue, execute, deliver, file, and record, as appropriate, such other contracts, instruments, indentures, mortgages, deeds, bills of sale, assignments, leases, or other agreements or documents, each as applicable, and to perform such other acts and execute and deliver such other documents, as are consistent with, and necessary, desirable or appropriate to implement, effectuate, and consummate, the Stalking Horse APA, any related agreements or instruments, and this Order and the Transactions contemplated thereby and hereby, all without further application to, or order of, the Court or further action by their respective directors, officers, managers, employees, members, agents, representatives, and attorneys, and with like effect as if such actions had been taken by unanimous action of the respective directors, officers, managers, employees, members, agents, representatives, and attorneys of such entities.  The Interim Chief Executive Officer, on behalf of the Debtors shall be, and hereby is, authorized to certify or attest to any of

19

the foregoing actions (but no such certification or attestation shall be required to make any such action valid, binding, and enforceable). The Debtors and the Buyer are further authorized and empowered to cause to be filed with the secretary of state of any state or other applicable officials of any applicable Governmental Entity or Unit (as defined in sections 101(27) and 101(41) of the Bankruptcy Code) any and all certificates, agreements, or amendments necessary or appropriate to effectuate the Transactions contemplated by the Stalking Horse APA, any related agreements and this Order, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable laws of all applicable Governmental Entity or Unit or as the Debtors may determine are necessary or appropriate. The execution of any such document or the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority of such person to so act. Without limiting the generality of the foregoing, this Order shall constitute all approvals and consents, if any, required by the corporate laws of the states of formation of each corporate Debtor and all other applicable business, corporation, trust, and other laws of the applicable Governmental Entity or Unit to the fullest extent permitted by law with respect to the implementation and consummation of the Stalking Horse APA, any related agreements or instruments and this Order, and the Transactions contemplated thereby and hereby.

12. To the fullest extent permitted by law, effective as of the Closing, (a) the transfer of the Purchased Assets to the Buyer shall constitute a legal, valid, and effective transfer of the Purchased Assets notwithstanding any requirement for approval or consent by any Person and shall vest the Buyer with all right, title, and interest of the Debtors in and to the Purchased Assets, free and clear of any Liens and Claims pursuant to section 363(f) of the Bankruptcy Code, and (b) the assumption of the Assumed Liabilities shall constitute a legal, valid and effective assumption by Buyer of all Assumed Liabilities.

13.     The sale of the Purchased Assets is not subject to avoidance pursuant to any statutory or common law fraudulent conveyance or fraudulent transfer theories whether under the Bankruptcy Code, including, without limitation, section 363(n), or under the laws of the United States, any state, territory, or possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

14.     At the Closing, the Debtors shall be, and hereby are, authorized, empowered, and directed, pursuant to sections 105, 363(b), and 365 of the Bankruptcy Code, to transfer any such Purchased Assets to the Buyer.  The transfer of the Purchased Assets shall vest the Buyer with all right, title and interest of the Debtors to the Purchased Assets, in each instance, free and clear of any Liens and Claims with all such Liens to attach only to the proceeds of the sale (if any) with the same priority, validity, force, and effect, if any, as they had prior to the Closing Date in or against the Purchased Assets, subject to all claims and defenses the Debtors may possess with respect thereto.  Following the Closing Date, no holder of any Liens, Claims or Encumbrances in the Purchased Assets shall interfere with the Buyer's enjoyment of the Purchased Assets based on or related to such Liens or any actions that the Debtors may take in the Debtors' bankruptcy cases and no person shall take any action to prevent, interfere with or otherwise enjoin consummation of the Transactions contemplated in or by the Stalking Horse APA or this Order and any such action is hereby forever barred, estopped and permanently enjoined by this Order.

15.     The provisions of this Order authorizing the sale of the Purchased Assets free and clear of any Liens and Claims shall be self-executing, and neither the Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Order.  However, the Debtors, the Buyer, and each of their respective officers, employees, attorneys, other retained

professionals, and agents are hereby authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Debtors or the Buyer deem necessary, desirable or appropriate to implement and effectuate the transactions contemplated by the Stalking Horse APA and this Order.

16. On or before the Closing Date, each of the Debtors and the Debtors' creditors, as the case may be, are authorized to execute such documents and to take all other actions as may be necessary to release, effective as of the Closing, any Liens and Claims (subject to the Permitted Liens) of any kind in respect of the Purchased Assets, if any, as may have been recorded or may otherwise exist. If any Person that has filed financing statements or other documents or agreements evidencing any Liens in respect of the Purchased Assets (subject to the Permitted Liens that the Buyer has agreed to permit to survive the Closing in accordance with the terms and subject to the conditions of the Stalking Horse APA) shall not have delivered to the Debtors prior to the Closing after request therefor, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases or agreements of similar import of all such Liens that the Person has in respect of the Purchased Assets, effective as of the Closing, the Debtors and the Buyer are hereby authorized to execute such statements, instruments, releases, and other documents on behalf of such Person in respect of such Purchased Assets prior to the Closing, and the Debtors and the Buyer are authorized to file such documents after Closing. The Debtors and the Buyer are hereby authorized, but not required, to (i) file, register or otherwise record a certified copy of this Order in the applicable jurisdiction, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all such Liens (subject to the Permitted Liens) against the Buyer and the applicable Purchased Assets and (ii) seek in this Court or any other court to compel appropriate parties to execute termination statements, instructions of

22

satisfaction and releases of all such Liens (other than Permitted Liens) in respect of the Purchased Assets.  Notwithstanding the foregoing, the provisions of this Order authorizing the sale and assignment of the Purchased Assets free and clear of Liens and Claims (other than Permitted Liens) shall be self-executing, and none of the Debtors, Debtors' former or current creditors or Buyer shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate and implement the provisions of this Order.

17.    The Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, approval, certificate of occupancy, authorization, operating permit, registration, plan and the like of any Governmental Entity or Unit relating to the Purchased Assets or held by the Debtors' estates, but solely with respect to those that are able to be transferred prior to the Closing Date and do not require further consent or authorization by a Government Entity to effect such transfer and maintain the related authorization.  To the greatest extent available under applicable law, all such licenses, permits, approvals, certificates of occupancy, authorizations, operating permits, registrations, plans and the like of any Governmental Entity or Unit are deemed to have been, and hereby are, deemed to be transferred to the Buyer, as of the Closing Date.  Furthermore, for licenses, permits and authorizations unable to be transferred prior to the Closing Date and/or that do require further consent or authorization by a Government Entity, the business covered by the Purchased Assets shall continue operating under all such existing licenses, permits and authorizations of the Debtors in accordance with any agreements or arrangements as may be permitted and/or directed by the applicable and appropriate regulatory authority and mutually acceptable to the Debtors and Buyer, with the advice of regulatory counsel, until such licenses, permits and authorizations have been transferred and changed to the name of the Buyer by the appropriate Government Entity, including, without limitation, any other licenses needed to operate

23

the Purchased Assets.  To the extent the Buyer cannot operate under any such license, permit, approval, certificate of occupancy, authorization, operating permit, registration, plan and the like of any Governmental Entity or Unit relating to the Purchased Assets in accordance with the preceding sentence, and those that are not able to be transferred, such shall remain in effect and with the Debtors while the Buyer, with the assistance from the Debtors in accordance with any agreements or arrangements as may be permitted and/or directed by the applicable and appropriate regulatory authority and mutually acceptable to the Debtors and Buyer, with the advice of regulatory counsel, works promptly and diligently to apply for and secure all necessary governmental approvals for new issuances of such and approval to the Buyer.

18.     The Purchased Assets to be acquired by the Buyer under the Stalking Horse APA shall be, as of the Closing Date and upon the occurrence of the Closing, transferred to and vested in the Buyer.  Upon the occurrence of the Closing, this Order shall be considered and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Debtors' interest in and to the Purchased Assets under the Stalking Horse APA and/or a bill of sale or assignment transferring good and marketable, indefeasible title and interest in and to the Purchased Assets to the Buyer.

19.     Upon the occurrence of the Closing, Debtors and Buyer shall, in compliance with Section 9.3 of the Stalking Horse APA, cause the Escrow Agent to release the Deposit in accordance with the terms and subject to the conditions of the Escrow Agreement.

20.     Other than the Assumed Liabilities, the Buyer is not assuming nor shall it or any affiliate of the Buyer be in any way liable or responsible, as a successor or otherwise, for any Liabilities of the Debtors in any way whatsoever, including any Liabilities relating to or arising from the Debtors' ownership or use of the Purchased Assets prior to the Closing Date, or any

Liabilities calculable by reference to the Debtors or their operations or the Purchased Assets, or relating to continuing or other conditions existing on or prior to the Closing Date, which Liabilities are hereby extinguished insofar as they may give rise to liability, successor or otherwise, against the Buyer or any affiliate of the Buyer.

21.     Except as otherwise expressly provided in the Stalking Horse APA, all persons presently or on or after the Closing Date in possession of some or all of the Purchased Assets are authorized and directed to surrender possession of the Purchased Assets to the Buyer, as applicable, on the Closing Date or at such time thereafter as the Buyer may request.

22.     Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the Transactions contemplated by the Stalking Horse APA and this Order.  This Order and the Stalking Horse APA shall be binding upon and govern the acts of all such federal, state, and local governmental agencies and departments, including any filing agents, filing officers, title agents, recording agencies, secretaries of state, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title in or to the Purchased Assets.

23.     To the extent permitted by section 525 of the Bankruptcy Code, no Governmental Entity or Unit may revoke or suspend any permit or license relating to the operation of the Purchased Assets sold, transferred, or conveyed to the Buyer on account of the filing or pendency of the Debtors' bankruptcy cases or the consummation of the Transactions contemplated by the Stalking Horse APA.

24. Other than the Assumed Liabilities, the Buyer has not assumed and is otherwise not obligated for any of the Debtors' liabilities, and the Buyer has not purchased any of the Debtors' assets expressly excluded from the Purchased Assets, as provided for in section 2.4 of the Stalking Horse APA. Consequently, all persons, Governmental Entities and Units and all holders of Liens (other than subject to the Permitted Liens) based upon or arising out of liabilities retained by the Debtors may not take any action against any of the Purchaser Parties or the Purchased Assets to recover on account of any liabilities of the Debtors (other than on account of the Assumed Liabilities).

25. The Buyer is not a "successor" to the Debtors or their estates by reason of any theory of law or equity, and the Buyer shall not assume, or be deemed to assume, or in any way be responsible for, any liability or obligation of any of the Debtors and/or their estates including, without limitation, any bulk sales law, successor liability, or similar liability. Neither the transfer of the Purchased Assets to the Buyer, nor the fact that the Buyer is using any of the Purchased Assets previously owned by the Debtors, will cause the Purchaser Parties, to be deemed a successor in any respect to the Debtors' business within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, environmental, or other law, rule or regulation (including, without limitation, filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine.

26. Further, except as otherwise provided in the Stalking Horse APA and subject to payments set forth in this Order, the transfer of title and possession of the Purchased Assets shall be free and clear of any Liens and Claims (including, without limitation, mechanics', materialmen's, repairmen's, and other consensual and non-consensual lien and statutory liens)

26

pursuant to any successor or successor-in-interest liability theory, and, the Buyer and the Purchaser Parties, and each of their affiliates, transferees, successors and assigns and each of their respective members, partners, officers, directors, principals, advisors and shareholders shall have no liability whatsoever for any Liens and Claims, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, whether liquidated or unliquidated, whether asserted derivatively or vicariously, whether asserted based on Buyer's status as a transferee, successor, or otherwise, of any kind, nature, or character whatsoever, including Liens and Claims based on, relating to, and/or arising under, without limitation: (i) any employment or labor agreement; (ii) any pension, welfare, compensation or other employee plan, agreements, practices, and programs, including, without limitation, any pension or employee plan of or related to any of the Debtors or any Debtors' affiliates or predecessors or any current or former employees of any of the foregoing; (iii) the Debtors' business operations or the cessation thereof; (iv) any litigation involving one or more of the Debtors; (v) any employee, workers' compensation, occupational disease or unemployment or temporary disability related law, including, without limitation, any claims, rights, or causes of action that might arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Worker Adjustment and Retraining Notification Act of 1988, (g) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (h) the Americans with Disabilities Act of 1990, (i) the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") (including, without limitation, (i) claims asserted by any individual who is not or was not (or whose alleged COBRA "qualifying event" is not or was not in connection with) a covered employee whose last employment prior to his or her alleged COBRA

27

"qualifying event" was associated with the Purchased Assets (as defined in the Stalking Horse APA), and/or (ii) excise taxes, penalties, and fees with respect to such individuals for periods on or after Closing), (j) the Multiemployer Pension Plan Amendments Act of 1980; (k) state and local discrimination laws, (l) state and local unemployment compensation laws or any other similar state and local laws, (m) state workers' compensation laws, and/or (n) any other state, local, or federal employee benefit laws, regulations or rules or other state, local or federal laws, regulations or rules relating to, wages, benefits, employment, or termination of employment with any or all Debtors or any of their predecessors; (vi) any antitrust laws; (vii) any product liability or similar laws, whether state, federal, or otherwise; (viii) any environmental laws, rules, or regulations, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, et seq., or similar state statutes; (ix) Perishable Agricultural Commodities Act; (x) any bulk sales or similar laws; (xi) any federal, state, or local tax statutes, rules, regulations, or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (xii) any common law doctrine of *de facto* merger, successor, transferee, or vicarious liability, substantial continuity liability, successor-in-interest liability theory, and/or any other theory of or related to successor liability.

27.     Except as otherwise provided in the Stalking Horse APA, pursuant to sections 105 and 363 of the Bankruptcy Code, all persons including, without limitation, the Debtors, all debt holders, equity security holders, the Debtors' employees or former employees, Governmental Entities or Units, lenders, parties to or beneficiaries under any benefit plan, trade and other creditors asserting or holding Liens and Claims of any kind or nature whatsoever against, in, or with respect to any of the Debtors or the Purchased Assets, arising under or out of, in connection with, or in any way relating to the Debtors, the Purchased Assets, the operation of the Debtors'

businesses prior to the Closing Date, or the transfer of the Purchased Assets to the Buyer in accordance with the Stalking Horse APA and this Order, shall be forever barred, estopped and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Liens and Claims, including assertion of any right of setoff or subrogation, and enforcement, attachment, or collection of any judgment, award, decree, or order, against the Purchaser Parties or any of their respective affiliates, transferees, successors or assigns thereof and each of their respective current and former members, officers, directors, attorneys, employees, partners, affiliates, financial advisors, and representatives (each of the foregoing in their individual capacity), in respect to the Purchased Assets.

28.     Preservation of Claims and Cause of Action.  Notwithstanding anything to the contrary in the Stalking Horse APA, all other documents contemplated thereby and this Order, nothing therein or herein, including the release of Liens and Claims in favor of the Purchaser Parties, shall release, bar, estop, or enjoin the assertion or prosecution of any claims or causes of action of the Debtors and their estates (or any successor Chapter 7 trustee) against any Person, including, without limitation, claims and causes of action the Debtors or their estates may have against any former director, manager, officer or employee of any of the Debtors or any of their respective affiliates in their capacities as such, in each case, other than releases with respect to (i) the Purchaser Parties, solely in their capacities as such, and (ii) the Chapter 11 Exculpated Parties (as defined below) and the Related Parties (as defined below) of the BXC Parties, Synovus and the Prepetition Agents as set forth in paragraph 45.

29.     North State Aviation Holdings, LLC ("North State") Resolution. Notwithstanding anything herein to the contrary, the following resolution shall apply to North State's sale objection [ECF No. 569]: (i) the liens that North State has on three aircraft, identified by tail numbers

29

N624XA, N806TJ, N629SW (the "North State Liens"), shall not be released until the following conditions are met: (i) the Debtors shall have paid North State $2,000,000.00 on account of its claims and (ii) the Court shall have entered this Order. Subject to satisfaction of the foregoing, North State will not file any motion seeking an administrative expense claim and further agrees that it will withdraw its opposition to the Sale contemplated herein. Nothing herein will be construed to require North State to provide goods or services to the Buyer, any such agreement shall be separately agreed to between North State and the Buyer. North State shall have an allowed general unsecured claim (Claim #215) in the Debtors' bankruptcy estates in the amount of $2,242,965.50.

30.    Laminaar Resolution. Notwithstanding anything to the contrary herein, the Debtors shall, three (3) days prior to the sale closing (the "Closing"), pay the total sum of (a) $85,537.50, plus (b) a per diem amount of $3,097.16 beginning on April 1, 2024 through the date that is three (3) days prior to the Closing, to Laminaar Aviation Infotech Pte. Ltd ("Laminaar") in full satisfaction of Laminaar's administrative expense claim (the "Laminaar Administrative Expense Claim Amount"). Upon the date that the Laminaar Administrative Expense Claim Amount has been paid in full, all contracts and agreements between the Debtors and Laminaar shall be deemed rejected pursuant to Section 365 of the Bankruptcy Code.

31.    Havana Air Resolution.  The Purchaser Parties will for a period of 3 years from the Closing Date, maintain and preserve records, whether in hard copy or digital and electronic form, of aircraft historical utilization and business transactions (the "Swift Records") that are provided to the Buyer from Debtors as part of the Purchased Assets related to Swift Air's charter flights flown by Swift Air, L.L.C. to and from Cuba after May of 2017, on behalf of the Havana Air Entities, Xeal, Invicta, AeroCuba, and Cubazuel (collectively, the "14 CFR Part 380 Agency

Certificate Holders"). The Havana Air Entities shall have reasonable access to the Swift Records for the purpose of litigation, defense, or claim prosecution in compliance with applicable discovery rules. For the avoidance of doubt, to the extent that they are provided to the Purchaser Parties by the Debtors, the Swift Records shall include, but not be limited to, all pilot flight records for flights for or on behalf of any 14 CFR Part 380 Agency Certificate Holders identified above from June 2017 to the Closing Date, all maintenance records for the airframe and engine for each aircraft that transported any of the 14 CFR Part 380 Agency Certificate Holders from 2017 to the Closing Date, all dispatch logs from all aircraft that transported 14 CFR Part 380 entities from 2017 to the Closing Date, documents from the airline choice departure control system software managed in-house by iAero or its own in-house software program which relates flight data to the Closing Date, eAPIS, boarding pass manifest for all flights provided to 14 CFR Part 380 Agency Certificate Holders from 2017 to the Closing Date, all records evidencing its on-time performance as it relates to Havana Air from 2017 to the Closing Date, and accounts payable and accounts receivable records as it relates to the 14 CFR Part 380 Agency Certificate Holders from 2017 to the Closing Date. The Havana Air Entities shall have reasonable access upon at least thirty days' notice, or such other time as may be agreed upon by the Buyer and the Havana Air Entities to the Swift Records for the purpose of litigation, defense, or claim prosecution in compliance with applicable discovery rules. The cost of transport and storage in Miami-Dade shall be paid solely by the Buyer. The Buyer does not warrant the accuracy of the Swift Records received from the Debtors. Nothing herein shall be construed to limit the Debtors' ongoing obligations to preserve their records. Notwithstanding anything else herein, any injunctions or releases provided in this Sale Order shall expressly exclude any injunctions or releases of liens, claims, counterclaims, rights of setoff or defenses by the Havana Air Entities against the Debtors which are expressly preserved herein.

32.     Aircrafters Resolution. Notwithstanding anything to the contrary in this Order or the Stalking Horse APA, the Debtors shall not sell, lease, or otherwise transfer to Buyer any goods, materials, or other property supplied to the Debtors by Aircrafters, Inc. or any of its affiliates (collectively, "Aircrafters") or remove from any of the Debtors' aircrafts, pursuant to that certain Advance Exchange Program Agreement (the "AEPA") and Equipment Security Agreement ("ESA") by and among Aircrafters and Debtor Swift Air, L.L.C., any of the Assemblies, Cores, or other Equipment (collectively, and as further defined in the AEPA or ESA, the "Aircrafters Property") that is currently in the Debtors' possession, and the Debtors hereby stipulate and agree that, immediately upon entry of this Order, the automatic stay of section 362 of the Bankruptcy Code (to the extent it applies) shall be modified for the sole purpose of permitting the Debtors to return, and Aircrafters to regain possession of, the Aircrafters Property.  The Debtors and the Buyer shall promptly facilitate access to the Aircrafters Property and will not impede the return of the Aircrafters Property.  Nothing in this Order or the Stalking Horse APA shall affect or impair Aircrafters' rights or interests in or to the Aircrafters Property.

33.     To the extent owned by Swift Air, either APU bearing serial number P-6198 or APU bearing serial number P-6686 (each a "Reserved APU") to which the Buyer and each of Bank of Utah, as Owner Trustee and Lessor, and Aviation Holdings III Investments, LLC, as the beneficiary, have expressed a claimed interest; upon a dispute as to the ownership of a Reserved APU that is not resolved upon written agreement between Lessor and Buyer prior to the Closing Date, Lessor and Buyer each reserve the right to seek resolution of such dispute with the Bankruptcy Court.

34.     The Debtors, Committee and Prepetition Secured Lenders Global Settlement. Set forth below in paragraphs 35 through 47 are the terms of the global settlement by and among the

32

Debtors, the Committee and the Prepetition Secured Lenders [ECF No. 596] (the "Global Settlement"), and shall be binding on the chapter 7 trustee ("Chapter 7 Trustee") appointed after entry of the Conversion Order (as defined below) and any successor chapter 7 trustee.

35.     Funded Indebtedness of the Debtors. The following table sets forth the outstanding indebtedness of the Debtors both prior to and following the Proposed Sale to Eastern:

| Funded Debt | |
|---|---|
| **Funded Indebtedness** | Outstanding indebtedness of the Debtors:[4]<br>• **First Incremental Synovus DIP** – $2,000,000<br><br>• **Second Incremental Synovus DIP** – $1,400,000 (together with the First Incremental Synovus DIP, the "Incremental Synovus DIP")<br><br>• **Prepetition Synovus 1L Term Loan Claims** – $50,000,000<br><br>• **Prepetition Synovus Aircraft Term Loan Claims** – $1,239,812<br><br>• **Synovus 2L DIP Claim** – $8,900,000<br><br>• **BXC 2L DIP Claim** – $13,800,000 (together with the Synovus 2L DIP Claim, the "Second Lien DIP Claims")<br><br>• **Prepetition Synovus 2L Term Loan Claims** – $24,254,247<br><br>• **Prepetition Synovus Bridge 2L Claims** – $6,207,273<br><br>• **Prepetition BXC Bridge 2L Claims** – $11,602,773<br><br>• **Prepetition BXC 3L Claims** – $765,303,599 |
| **Funded Indebtedness Following Eastern Sale** | Outstanding indebtedness of the Debtors following the sale to Eastern:[5]<br><br>• **First Incremental Synovus DIP** – $2,000,000<br><br>• **Second Incremental Synovus DIP** – $1,400,000 (together with the First Incremental Synovus DIP, the "Incremental Synovus DIP")<br><br>• **Synovus 2L DIP Claim** – $7,340,000 (the "Synovus 2L DIP Claims") |

---

[4] Excludes accrued and unpaid interest (including any unpaid deferred interest) and unpaid fees.
[5] Excludes accrued and unpaid interest (including any unpaid deferred interest) and unpaid fees.

33

| Funded Debt |
|---|
| • **BXC 2L DIP Claim** – $13,800,000(the "BXC 2L DIP Claims") <br><br> • **Prepetition Synovus 2L Term Loan Claims** – $13,580,000 (the "Prepetition Synovus 2L Term Loan Claims") <br><br> • **Prepetition Synovus Bridge 2L Claims** – $3,460,000 (the "Prepetition Synovus Bridge 2L Claims") <br><br> • **Prepetition BXC Bridge 2L Claims** – $11,602,773 (together with the Synovus 2L DIP Claims, BXC 2L DIP Claims, Prepetition Synovus 2L Term Loan Claims, the Prepetition Synovus Bridge 2L Claims, and any accrued and unpaid interest (including any unpaid deferred interest) and any unpaid fees, the "Second Lien Claims") <br><br> • **Prepetition BXC 3L Claims** – $765,303,599 |

36.      Repayment of the First Incremental Synovus DIP. Upon entry of this Order, the Debtors shall pay in cash and in full to Synovus the First Incremental Synovus DIP in the amount of $2,000,000.

37.      Initial Synovus Funding. Synovus shall fund the incremental amount of $150,000, pursuant to the DIP Orders (as defined below), to the Chapter 7 Trustee (the "Initial Synovus Funding") upon the entry of the Conversion Order (as defined below); for the avoidance of doubt, the Initial Synovus Funding shall be in addition to the $100,000 Carve-Out for the Chapter 7 Trustee as provided for in the Final DIP Order [ECF No. 191 at ¶15].

38.      Subject to the Proceeds Waterfall (as defined below), Synovus and the BXC Parties agree to release and waive, on account of any tranche of their funded indebtedness as outlined above, and pursuant to the DIP orders [ECF Nos. 191, 412, and 500] (the "DIP Orders"), (x) any and all liens on proceeds from (i) claims and causes of action (whether based in tort, contract, statute or otherwise), demands, rights of recovery, rights of repayment or reimbursement, rights of setoff, rights of recoupment and other causes of action, including but not limited to estate claims

34

and causes of action against former directors, managers, officers and employees of the Debtors (the "Specified Claims"); and (ii) Chapter 5 avoidance actions, other than those avoidance actions, if any, against the Chapter 11 Exculpated Parties (as defined below) or the Related Parties (as defined below) of the BXC Parties, Synovus and the Prepetition Agents (the "Avoidance Claims"), and (y) any and all super priority administrative expense claims related to, and adequate protection claims secured by, proceeds from the Specified Claims and Avoidance Claims.

39.    Proceeds Waterfall. Proceeds from the Specified Claims and Avoidance Claims shall be paid in the following order (the "Proceeds Waterfall"):

    a.    To the extent that the First Incremental Synovus DIP is not already paid in cash in full, any remaining unpaid portion of the First Incremental Synovus DIP shall be paid in cash in full.

    b.    Any unpaid portion of the Second Incremental Synovus DIP that remains unpaid after giving effect to (i) the $200,000 in the Debtor professional fees arrangement put on the record at the Sale Hearing and Continued Sale Hearing and (ii) and any surplus available upon the liquidation of the Certificate of Deposit backstopping the Debtors' purchase card, as well as any surplus received from the Debtors' bankruptcy estates shall be paid in cash in full.

    c.    The Initial Synovus Funding shall be paid in cash in full.

    d.    The Chapter 7 Trustee shall receive $3,000,000 in net proceeds[6] from the Specified Claims and Avoidance Claims, which shall be paid by the Chapter 7 Trustee to allowed chapter 11 administrative expense claims.

---

[6] The term "net proceeds" as used in paragraph 39 of this Order shall mean gross recoveries received by the Chapter 7 Trustee from a Specified Claim or an Avoidance Claim, minus the direct fees and costs of obtaining the particular recovery, including counsel fees incurred in obtaining the recovery, Chapter 7 Trustee fees payable with respect to such recovery, and litigation costs and expenses incurred in obtaining the recovery.

e. Additional net proceeds from the Specified Claims and Avoidance Claims, shall be received by the Chapter 7 Trustee and disbursed as follows: (i) 25% to Synovus and the BXC Parties (shared pro rata based on their respective Second Lien Claims then outstanding) until such time as the Second Lien Claims of Synovus and the BXC Parties are fully satisfied, and (ii) 75% to holders of allowed chapter 11 administrative expense claims, *provided, however*, that the first $100,000 allocated collectively to Synovus and the BXC Parties under this subsection (e) shall be paid first to Synovus before funds are shared pro rata between those parties.

40. This Order is binding on the Chapter 7 Trustee; provided, however, nothing in this Order shall prevent the Chapter 7 Trustee from seeking relief from this Court for an order that would allow him or her to withhold from the distribution(s) to the holders of allowed chapter 11 administrative expense claims (other than any such claims held by Synovus or the BXC Parties) funds for the payment of allowed chapter 7 administrative expenses if the funds provided to such trustee under the terms of this Order are insufficient to pay such expenses.

41. Synovus and the BXC Parties agree to release and waive any and all liens on, and recovery from, that certain Convertible Note, dated as of October 9, 2019, made by Seven Seas Aero, LLC in favor of Debtor iAero 11 Investments LLC, in the principal sum of $8,700,000 (the "Seven Seas Note").

42. Any recoveries received by Synovus or the BXC Parties from the bankruptcy estates shall be applied by each of Synovus and the BXC Parties, as applicable, first to satisfy any balance remaining on such party's DIP Claims.

43. No later than by April 12, 2024, the Debtors shall file a motion (the "Conversion Motion") for entry of an order converting these Chapter 11 Cases to cases under chapter 7 of the

36

Bankruptcy Code (the "Conversion Order"), which form shall be reasonably acceptable to Synovus, the BXC Parties, and the Committee. The parties shall further agree to shortened notice to approve the Conversion Motion. For the avoidance of doubt, a condition precedent to closing the Proposed Sale as contemplated by this Order shall be that the Conversion Order is not entered by the Court prior to the Closing Date.

44.     Notice of Closing Date. Following entry of this Order and upon satisfaction of the conditions set forth in Article VIII of the Stalking Horse APA, the Debtors shall file a notice of the Closing Date within one business day of the Closing Date (such notice, the "Closing Date Notice").

45.     Releases. Notwithstanding anything to the contrary contained herein, the Debtors and the Committee hereby fully and irrevocably release any and all potential claims (including any claims subject to the Challenge Period (as defined in the Final DIP Order [ECF No. 191])) against or with respect to the Chapter 11 Exculpated Parties (as defined below) and the Related Parties (as defined below) of the BXC Parties, Synovus and the Prepetition Agents, without limitation or prejudice to the already-existing releases approved by the Court in favor of Synovus and the BXC Parties. The releases referenced herein shall be binding upon the Chapter 7 Trustee.

46.     Chapter 11 Exculpated Parties. The following shall constitute the exculpated parties (the "Chapter 11 Exculpated Parties"): (a) the Interim Chief Executive Officer; (b) the Consenting Stakeholders; (c) the DIP Lenders (as defined in the Final DIP Order); (d) the DIP Agent (as defined in the Final DIP Order); (e) the Prepetition Agents (as defined in the Final DIP Order); (f) advisors to the Consenting Stakeholders; (g) the professionals retained by order of the Bankruptcy Court to represent the Debtors and Committee, including professional retained pursuant to the OCP

37

Order [ECF No. 185]; (h) the Debtors' managers, directors and officers on and after the Petition Date; and (i) the Committee and each of its members.

47.     "Related Parties" shall mean each of the BXC Parties' and Synovus's respective predecessors, successors and assigns, parents, subsidiaries, affiliates, managed accounts or funds, and all of their respective current and former officers, directors, managers, principals, shareholders (and any fund managers, fiduciaries or other agents of shareholders with any involvement related to the Debtors, but *not* solely in any such person's capacity as a shareholder of any public company), members, partners (including both general and limited partners), employees, independent contractors, agents, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, fund advisors, investment advisors and other professionals and advisors, and such persons' respective heirs, executors, estates, servants and nominees.

48.     In accordance with the terms and subject to the conditions of the Stalking Horse APA, the Stalking Horse APA and any related agreements and/or instruments may be waived, modified, amended, or supplemented by agreement of the Debtors and the Buyer, without further action or order of the Court; provided, however, that any such waiver, modification, amendment, or supplement is not materially adverse to the Debtors' estates and substantially conforms to, and effectuates, the Stalking Horse APA and any related agreements and/or instruments and this Order.

49.     No bulk sale law or any similar law of any state or other jurisdiction shall apply in any way to the sale and the Transactions contemplated by the Stalking Horse APA.

50.     The Debtors are authorized and directed to transfer personally identifiable information, as defined in section 101(41)(A) of the Bankruptcy Code, as a part of the Sale.  No consumer privacy ombudsman need be appointed under section 363(b)(1) of the Bankruptcy Code.

38

51.     This Order and the Stalking Horse APA shall be binding upon, enforceable against, and govern the acts of all persons including, without limitation, the Debtors and their estates, the Purchaser Parties, their respective affiliates, transferees, successors, and permitted assigns, including, without limitation, any Chapter 11 trustee hereinafter appointed for the Debtors' estates, any statutory committee appointed in the Debtors' bankruptcy cases or any trustee appointed in a Chapter 7 case if the cases of the Debtors are converted from Chapter 11 to a case under Chapter 7 of the Bankruptcy Code, all creditors of any Debtor (whether known or unknown), filing agents, filing officers, title agents, recording agencies, secretaries of state, and all other Persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title in or to the Purchased Assets.  If any order under section 1112 of the Bankruptcy Code is entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that this Order and the rights granted to the Buyer hereunder shall remain effective and, notwithstanding such conversion or dismissal, shall remain binding on all parties in interest.  The Debtors' inability to satisfy in full all allowed administrative expense claims of the Debtors' estates shall not be a basis for termination, rejection or avoidance (as applicable) of the Stalking Horse APA or the Sale.

52.     This Order shall be binding upon and govern the acts of all persons, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, county and local officials and all other Persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments that reflect that the Buyer is the assignee and owner of the Purchased

Assets, and ownership of the Purchased Assets is free and clear of any Liens and Claims or any Person who may be required to report or insure any title or state of title in or to any lease (all such entities being referred to as "Recording Officers").  All Recording Officers, including without limitation, the Aircraft Registration Branch of the Federal Aviation Administration, are authorized to strike recorded encumbrances, claims, liens, and other interests against the Purchased Assets, including without limitation the FAA Liens noted against each airframe and engine on **Schedule 2** hereto, owned by the Debtors recorded prior to the date of this Order.  A certified copy of this Order may be filed with the appropriate Recording Officers to evidence cancellation of any recorded encumbrances, Claims, Liens, pledges, and other interests against the Purchased Assets owned by the Debtors recorded prior to the date of this Order.  All Recording Officers are hereby authorized to accept for filing any and all of the documents and instruments necessary, advisable or appropriate, and appropriate to consummate the transactions contemplated by the Stalking Horse APA.

53.     Nothing in any other order of this Court or contained in any plan of reorganization or liquidation that may be confirmed in the cases of the Debtors, or in any subsequent or converted cases of the Debtors to cases under Chapter 7 of the Bankruptcy Code, shall conflict with or derogate from the provisions of the Stalking Horse APA or the terms of this Order.

54.     Notwithstanding Bankruptcy Rules 6004, 6006, and 7062, this Order shall be effective and enforceable immediately upon its entry and its provisions shall be self-executing. The Debtors and the Buyer are free to close under the Stalking Horse APA at any time, subject to the express terms of the Stalking Horse APA.  If the Debtors and the Buyer close under the Stalking Horse APA, the Debtors and the Buyer shall be deemed to be acting in "good faith" and the Buyer

shall be entitled to the protections of section 363(m) of the Bankruptcy Code as to all aspects of the Transactions under and pursuant to the Stalking Horse APA.

55.    The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to implement the transactions contemplated by the Stalking Horse APA and the provisions of this Order.

56.    The provisions of this Order shall be binding on and inure to the benefit of all successors and assignees of the Debtors and the Buyer.

57.    The Debtors are authorized to enforce their rights under any confidentiality agreements they entered into with (i) other potential bidders with respect to the Purchased Assets for the benefit of the Buyer or (ii) any other interested parties with respect to these bankruptcy cases or pre-petition information that is otherwise confidential for the benefit of other protected parties in interest, in each case for the term of each respective confidentiality agreement.

58.    In the event there is any inconsistency between the Sale Motions or this Order, this Order shall govern.  In the event there is any inconsistency between the terms of this Order and the terms of the Stalking Horse APA, the terms of this Order shall govern.

59.    Upon the Closing Date, the Debtors are authorized to set aside amounts for payment of heavy check maintenance contemplated under the Approved Budget attached as Exhibit B to the *Order (I) Authorizing the Debtors to Enter Into the Second Amendment to the DIP Credit Agreement and (II) Granting Related Relief* [ECF No. 500] in a dedicated controlled account at Synovus Bank. For the avoidance of doubt, such amount shall not exceed the allocated amount under the Approved Budget.

60.    This Court shall retain exclusive jurisdiction to enforce the terms and provisions of this Order, the Bidding Procedures Order, the Bid Protections Order and the Stalking Horse APA

41

in all respects and to decide any disputes concerning this Order, the Bidding Procedures Order, the Bid Protections Order, the Stalking Horse APA, or the rights and duties of the parties hereunder or thereunder or any issues relating to the Stalking Horse APA, the Bidding Procedures Order, Bid Protections Order and this Order including, without limitation, the interpretation of the terms, conditions and provisions hereof and thereof, the status, nature and extent of the Purchased Assets, and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the Purchased Assets free and clear of any Liens and Claims and any actions, efforts and/or conduct designed to deprive the Buyer of the Purchased Assets; provided, however, that, in the event the Court abstains from exercising or declines to exercise such jurisdiction with respect to the Stalking Horse APA, the Bidding Procedures Order, the Bid Protections Order or this Order, such abstention, refusal or lack of jurisdiction shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.

61.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

62.     The provisions of this Order are non-severable and mutually dependent.

# # #

**Submitted by:**
Paul Steven Singerman, Esq.
Berger Singerman LLP
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Tel. (305) 755-9500
Fax (305) 714-4340
Email:  singerman@bergersingerman.com

*(Attorney Singerman is directed to serve this order upon all non-registered users who have yet to appear electronically in this case and file a conforming certificate of service.)*

**Schedule 1**

**Schedule 2.1**

## PURCHASED ASSETS[1]

| MSN | N | ESN #1 | ESN #2 | APU |
|---|---|---|---|---|
| 23538 | N811 | 858287 | 721651 | P60486C |
| 27701 | N625 | 722433 | 723224 | P100732 |
| 27704 | N629 | 727260 | 724707 | P60372C |
| 23988 | N804 | 721566 | 857853 | P-100281 |
| 24560 | N438 | 726485 | 857388 | P-173C |
| 25771 | N802 | 725101 | 727262 | P100633 |
| 25313 | N313 | NA | 857868 | P100647 |
| 25314 | N314 | 857635 | 720891 | P100499 |
| 27081 | N806 | NA | NA | P101006 |
| 25098 | N807 | 721179 | 726196 | P100429 |
| 25103 | N808 | 721154 | 722426 | P100199 |
| 27149 | N149 | 856180 | 856557 | P100223 |
| 27156 | N803 | 858366 | 859323 | P50115C |
| 25771 | N545 | 856333 | 726312 | P100676 |
| 32624 | N624 | 875363 | 895165 | P-6070 |
| 32917 | N917 | 891221 | 888816 | P-6334 |
| 24411 | N529 | NA | 721896 | P-100023C |
| 24478 | N531 | NA | NA | P-35338C |
| 27691 | N397 | NA | 858121 | P100764 |
| 27933 | N623 | 721311 | 856379 | P90174 |
| 27702 | N626 | 857979 | NA | P100114 |
| 27935 | N627 | NA | 857896 | P100222 |
| 23985 | N418 | NA | NA | NA |
| 24811 | N440 | NA | NA | P100846C |
| 25022 | N458 | NA | NA | P60416C |
| 25430 | N430 | NA | NA | P100385 |
| 26285 | N285 | NA | NA | P35316C |
| 26603 | N263 | NA | NA | P34836C |
| 25772 | N538 | NA | NA | P-10008 |
|  |  | 724576 |  | P-100385 |
|  |  | 725204 |  | P-100922 |
|  |  | 725660 |  | P-100977 |
|  |  | 721550 |  | P-34836C |
|  |  | 721212 |  | P100385 |
|  |  | 727139 |  | P37038C |
|  |  | 856902 |  | P100156 |
|  |  | 725710 |  | P6686 |
|  |  | 721180 |  | P7573 |
|  |  | 721759 |  | P5856 |
|  |  | 725124 |  | P5456 |
|  |  | 727144 |  |  |
|  |  | 721217 |  |  |
|  |  | 725288 |  |  |
|  |  | 725341 |  |  |
|  |  | 857862 |  |  |
|  |  | 858769 |  |  |
|  |  | 724815 |  |  |

---

[1] Additional detail regarding the airframes (including manufacturer, model, serial and registration numbers), engines (including manufacturer, model and serial number) and auxiliary power units as well as the FAA liens existing on such assets as of the date of this Order is attached hereto as Schedule 2. In the event of a conflict between the information on this schedule and Schedule 2, this schedule shall control.

865304
858900
725186

**Additional Assets**

- Hawker model 800XP, ESN 258638, Engines ESN P107825 and P107826m together with all components, accessories, systems, appliances, parts, instruments, and furnishings, in each case owned by and in the possession of Seller.

- All records owned by Seller and identified in the ARMS System[2] with all records for aircraft, engines, APU's, Landing Gear and all other associated assets, in each case owned by and in the possession of Seller.

- All documents[3] owned by and in the possession of Seller related to work being completed on the aircraft, status of work done, work to be done, amount paid and outstanding exposure for completion and identified dates for completion.

- Records in the possession of Seller for all aircraft, engines, APUs, landing gear, inventory at all locations, and all other associated and related assets.

- All parts, inventory, equipment including hard time items, landing gear, slides, flashlights, and all other safety equipment with each aircraft, in each case that is owned by Seller.

- All off-wing APUs, engines, respective stands for all equipment, in each case that is owned by Seller.

- All landing gear inventory not installed, tooling, documents and records for the Hawker, in each case that is owned by Seller and, in the case of documents and records that is owned by and in the possession of Seller.

- All log books and related documents for each aircraft, in each case that is owned by and in the possession of Seller.

- All equipment, including but not limited to, pushback vehicles, belt loaders, tugs, tow bars, automobiles, lifts, tooling, calibrated tooling, air start machines, ground power units, and related equipment, in each case that is owned by Seller.

- All electronic equipment, including computers, electronic devices, EFBs, printers, servers, with all codes and access detail, in each case that is owned by Seller and the case of codes and access detail is known to Seller; provided, however, that all data on any such electronic equipment is an Excluded Asset except if it relates solely to the Purchased Assets. Seller shall cooperate with Buyer to transfer any data related solely to the Purchased Assets to Buyer and Buyer shall cooperate with Seller to transfer all other data to Seller; disclosure of any such data, whether inadvertent or otherwise, is not intended to waive privilege or confidentiality.

- All programs and system and training equipment, in each case that is owned, freely transferable by and in the possession of Seller.

---

[2] The ARMS system is not owned by Seller. It is licensed software and Buyer will need to obtain its own license.

[3] Reference to "documents" and "records" throughout this Schedule 2.1 includes all documents and all records whether in paper or electronic form, in each case solely to the extent owned by and in the possession of Seller.

**Schedule 2**

## PURCHASED ASSETS AND FAA LIENS

| Airframe Manufacturer and Model | Airframe MSN | Registration Number | FAA Liens (Airframe) | Engine Manufacturer and Model and ESN #1 | Engine Manufacturer and Model and ESN #2 | FAA Liens (Engine) | APU |
|---|---|---|---|---|---|---|---|
| Boeing 737-306 | 23538 | N811TJ | 1,2,3, and 4 | CFM International CFM56-3B1, ESN 858287 (also described as CFM56-3B-1) | CFM International CFM56-3C, ESN 721651 | 1,2,3, and 4 | P60486C |
| Boeing 737-3H4 | 27701 | N625SW | 1, 2, 3, 4, and 17 | CFM International CFM56-3B2, ESN 722433 (also described as CFM56-3B1) | CFM International CF56-3B1, ESN 723224 (also described as CFM56-3-B1 and CFM-56-3-51) | 1,2,3, and 4 | P100732 |
| Boeing 737-3H4 | 27704 | N629SW | 1,2, 3, 4 and 5 | CFM International CFM56-3C1, ESN 727260 (also described as CFM56-3C-1) | CFM International CF56-3-B1, ESN 724707 (also described as CFM56-3B2) | 1,2,3 and 4 | P60372C |
| Boeing 737-401 | 23988 | N804TJ | 1,2,3, and 4 | CFM International CFM56-3B2, ESN 721566 (also described as CFM56-3B-2) | CFM International CFM56-3C-1, ESN 857853 (also described as CFM56-3C1) | 1,2,3, and 4 | P-100281 |
| Boeing 737-4B7 | 24560 | N438US | 1,2,3, 4, and 18 | CFM International CFM56-3C-1, ESN 726485 | n/a | 1,2,3, and 4 | P-173C |
| Boeing 737-48E | 24874 | N802TJ | 1,2,3, and 4 | CFM International CFM56-3B-2, ESN 725101 | CFM International CFM56-3C-1, ESN 727262 | 1,2,3, and 4 | P100633 |
| Boeing 737-484 | 25313 | N313XA | 1,2,3, and 4 | NA | CFM International CFM56-3C-1, ESN 857868 (also described as CFM56-3C1) | 1,2,3, and 4 | P100647 |
| Boeing 737-484 | 25314 | N314XA | 1,2,3,4,6, and 7 | CFM International CFM56-3C-1, ESN 857635 (also described as CFM56-3C1) | CFM International CFM56-3C1, ESN 720891 | 1,2,3, and 4 | P100499 |
| Boeing 737-490 | 27081 | N806TJ | 1,2,3,4,8, and 9 | NA | NA | | P101006 |
| Boeing 737-4Q8 | 25098 | N807TJ | 1,2,3, and 4 | CFM International CFM56-3C1, ESN 721179 | CFM International CFM56-3C1, ESN 726196 | 1,2,3, and 4 | P100429 |
| Boeing 737-4Q8 | 25103 | N808TJ | 1,2,3, and 4 | CFM International CFM56-3B2, ESN 721154 | CFM International CFM56-3B-2, ESN 722426 (also described as CFM56-3B2) | 1,2,3, and 4 | P100199 |
| Boeing 737-484 | 27149 | N149XA | 1,2,3, and 4 | CFM International CFM56-3C1, ESN 856180 | CFM International CFM56-3C1, ESN 856557 | 1,2,3, and 4 | P100223 |
| Boeing 737-400 | 27156 | N803TJ | 1,2,3,4, and 10 | CFM International | CFM International | 1,2,3, and 4 | P50115C |

Schedule 2 – Page 1 of 8

| | | | | CFM56-3B1, ESN 858366 (also described as CFM56-3B-1) | CFM56-3B2, ESN 859323 | | |
|---|---|---|---|---|---|---|---|
| Boeing 737-48E | 25771 | N545CC | 1, 2, 3 and 4 | CFM International CFM56-3C, ESN 856333 (also described as CFM-56-3C) | CFM International CFM56-3C1, ESN726312 | 1, 2, 3 and 4 | P100676 |
| Boeing 737-86J | 32624 | N624XA | 1, 2, 3, 4, 15, 16, and 20 | CFM International CFM56-7B26, ESN 875363 | CFM International CFM56-7B26, ESN 895165 | 1 2, 3 and 4 | P-6070 |
| Boeing 737-86J | 32917 | N917XA | 1, 2, 3, 4, and 20 | CFM International CFM56-7B26, ESN 891211 | CFM International CFM56-7B26, ESN 888816 | 1, 2, 3 and 4 | P-6334 |
| Boeing 737-3B7 | 24411 | N529AU | 1, 2, 3, 4 and 19 | NA | CFM International CFM56-3B-2, ESN 721896 | 1, 2, 3 and 4 | P-100023C |
| Boeing 737-3B7 | 24478 | N531AU | 1, 2, 3 4 and 14 | NA | NA | | P-35338C |
| Boeing 737-3H4 | 27691 | N397SW | 1, 2, 3 and 4 | NA | CFM International CFM56-3B-2, ESN 858121 (also described as CFM56-3B2) | 1, 2, 3 and 4 | P100764 |
| Boeing 737-3H4 | 27933 | N623SW | 1, 2, 3 , 4 and 13 | CFM International CFM56-3B1, ESN 721311 | CFM International CFM56-3C1, ESN 856379 | 1, 2 and 4 | P90174 |
| Boeing 737-3H4 | 27702 | N626SW | 1, 2, 3, 4 and 12 | CFM International CFM56-3C, ESN 857979 | NA | 1, 2, 3 and 4 | P100114 |
| Boeing 737-3H4 | 27935 | N627SW | 1, 2, 3 and 4 | NA | CFM International CFM56-3B-1, ESN 857896 | 1, 2, 3 and 4 | P100222 |
| Boeing 737-401 | 23985 | N418US | 1, 2, 3 and 4 | NA | NA | | NA |
| Boeing 737-4B7 | 24811 | N440US | 1, 2, 3 and 4 | NA | NA | | P100846C |
| Boeing 737-4B7 | 25022 | N458UW | 1, 2, 3 and 4 | NA | NA | | P60416C |
| Boeing 737-484 | 25430 | N430XA | 1, 2, 3, 4 and 11 | NA | NA | | P100385 |
| Boeing 737-4Q8 | 26285 | N285XA | 1, 2, 3 and 4 | NA | NA | | P35316C |
| Boeing 737-400 | 26603 | N263LM | 1, 2, 3 and 4 | NA | NA | | P34836C |
| Boeing 737-48E | 25772 | N538CC | 1, 2, 3 and 4 | NA | NA | | P-10008 |
| | | | | CFM International CFM56-3B2, ESN 724576 | | 1, 2, 3 and 4 | P-100385 |
| | | | | CFM International CFM56-3B2, ESN 725204 | | 1, 2, 3 and 4 | P-100922 |
| | | | | CFM International CFM56-3B2, ESN 725660 (also described as CFM56-3) | | 1, 2, 3 and 4 | P-100977 |
| | | | | CFM International CFM56-3B2, | | N/A | P-34836C |

Schedule 2 – Page 2 of 8

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | ESN 721550 | | | |
| | | | | CFM International CFM56-3B2, ESN 721212 (also described as CFM56-3B-1) | | 1, 2, 3 and 4 | P100385 |
| | | | | CFM International CFM56-3B2, ESN 727139 | | 1, 2, 3 and 4 | P37038C |
| | | | | CFM International CFM56-3B2, ESN 856902 | | 1, 2, 3 and 4 | P100156 |
| | | | | CFM International CFM56-3B1, ESN 725710 | | 1, 2, 3 and 4 | P6686 |
| | | | | CFM International CFM56-3C1, ESN 721180 | | 1, 2, 3 and 4 | P7573 |
| | | | | CFM International CFM56-3C1, ESN 721759 | | 1, 2, 3 and 4 | P5856 |
| | | | | CFM International CFM56-3B2, ESN 725124 (also described as CFM56-3B-2) | | 1, 2, 3 and 4 | P5456 |
| | | | | CFM International CFM56-3C1, ESN 727144 | | 1 and 21 | |
| | | | | CFM International CFM56-3B-2, ESN 721217 | | 1, 2, 3 and 4 | |
| | | | | CFM International CFM56-3C1 ESN 725788 | | 1,2,3, and 4 | |
| | | | | CFM International CFM56-3B-2, ESN 725341 | | 1, 2, 3 and 4 | |
| | | | | CFM International CFM56-3C1, ESN 857862 | | 1, 2, 3 and 4 | |
| | | | | CFM International CFM56-3C1, ESN 858769 | | 1, 2, 3 and 4 | |
| | | | | CFM International CFM56-3C1, ESN 724815 | | 1, 2, 3 and 4 | |
| | | | | CFM International CFM56-3C1, ESN 856304 | | 1, 2, 3 and 4 | |
| | | | | CFM International CFM56-3C-1, ESN 858900 (also described as CFM-56-3C-1 and CFM56-3C- | | 1, 2, 3 and 4 | |

|  |  |  |  |  |  |  |  |
|--|--|--|--|--|--|--|--|
|  |  |  |  | 1) |  |  |  |
|  |  |  |  | CFM International CFM56-3, ESN 725186 (also described as CFM56-3C-1) |  | 1, 2, 3 and 4 |  |
|  |  |  |  | CFM International CFM56-3C1, ESN 857388 |  | 1, 2 and 4 |  |

**FAA LIENS**

(1)    FAA Aircraft Mortgage dated as of May 22, 2019, between Swift Air, L.L.C. ("Swift"), as mortgagor, and Wilmington Trust, National Association ("Wilmington"), as mortgagee, with various related Irrevocable De-Registration and Export Request Authorizations ("IDERAs"), dated May 22, 2019, executed by Swift, attached, recorded by the FAA as one instrument on June 26, 2019, and assigned conveyance number SY008385, as supplemented by the following:

(i)    Supplement No. 1 to FAA Aircraft Mortgage and Subordination Agreement, dated as of September 20, 2019, between Swift, as mortgagor, and Wilmington, as mortgagee, with Intercreditor Agreement, dated as of September 20, 2019, between Synovus Bank ("Synovus"), as revolving lender, and Wilmington, as term loan agent, acknowledged by Swift, attached, recorded by the FAA as one instrument on October 21, 2019, and assigned conveyance number BS015215;

(ii)    Supplement No. 2 to FAA Aircraft Mortgage and Subordination Agreement, dated as of March 23, 2021, between Swift, as mortgagor, and Wilmington, as mortgagee, with Amendment to Intercreditor Agreement, dated as of March 23, 2021, between Synovus, as revolving lender, and Wilmington, as term loan agent, and various related IDERAs, attached, recorded by the FAA as one instrument on June 1, 2021, and assigned conveyance number BS020018;

(iii)    Supplement No. 3 to FAA Aircraft Mortgage and Subordination Agreement, dated as of July 12, 2023, between Swift, as mortgagor, and Wilmington, as mortgagee, with various related IDERAs, attached, recorded by the FAA as one instrument on October 25, 2023, and assigned conveyance number LT033542; and

(iv)    Supplement No. 4 to FAA Aircraft Mortgage and Subordination Agreement, dated as of July 17, 2023, between Swift, as mortgagor, and Wilmington, as mortgagee, recorded by the FAA on August 22, 2023, and assigned conveyance number LJ026940.

(2)    FAA Aircraft Mortgage, dated as of August 28, 2023, between Swift, as mortgagor, and Wilmington, as mortgagee, with Amended and Restated Intercreditor Agreement, dated as of August 28, 2023, among Synovus, as first lien collateral agent and Synovus second lien collateral agent, Wilmington, as second lien collateral agent and third lien collateral agent, acknowledged by Swift, and various IDERAs, dated August 28, 2023, attached, recorded

by the FAA as one instrument on October 25, 2023, and assigned conveyance number LT033540.

(3)    FAA Aircraft Mortgage, dated as of September 20, 2019, between Swift, as mortgagor, and Synovus, as mortgagee, with various related Irrevocable De-Registration and Export Request Authorizations ("IDERAs"), executed by Swift, and Intercreditor Agreement, dated as of September 20, 2019, between Synovus, as revolving lender, and Wilmington, as term loan agent, acknowledged by Swift, attached, recorded by the Federal Aviation Administration ("FAA") as one instrument on October 2, 2019, and assigned conveyance number GR006626, as modified by the following:

   (i)    FAA Aircraft Mortgage Modification Agreement, dated March 23, 2021, between Swift, as mortgagor, and Synovus, as mortgagee, with Amendment to Intercreditor Agreement, dated as of March 23, 2021, between Synovus, as revolving lender, and Wilmington, as term loan agent, and various related IDERAs, dated March 23, 2021, executed by Swift, attached, recorded by the FAA as one instrument on June 1, 2021, and assigned conveyance number BS020017; and

   (ii)   FAA Aircraft Mortgage Modification Agreement No. 2, dated October 20, 2022, between Swift, as mortgagor, and Synovus, as mortgagee, with Third Amendment to Intercreditor Agreement, dated as of October 20, 2022, between Synovus, as revolving lender, and Wilmington, as term loan agent, and various related IDERAs, dated October 20, 2022, executed by Swift, attached, recorded by the FAA as one instrument on February 27, 2023, and assigned conveyance number SY017659; and

(4)    FAA Aircraft Mortgage, dated as of August 28, 2023, between Swift, as mortgagor, and Synovus, as mortgagee, with Amended and Restated Intercreditor Agreement, dated as of August  28, 2023, among Synovus, as first lien collateral agent and Synovus second lien collateral agent, Wilmington, as second lien collateral agent and third lien collateral agent, acknowledged by Swift, and various IDERAs, dated August 28, 2023, attached, recorded by the FAA as one instrument on October 25, 2023, and assigned conveyance number LT033541.

(5)    Supplemental Notice of Lien on Aircraft, dated February 7, 2024, executed by North State Aviation Holdings, LLC, as Lienor, recorded by the FAA on March 1, 2024, and assigned conveyance number IR046006.

(6)    Mechanic's Lien, dated November 2, 2022, executed by Sky Capital Partners Inc, as claimant, filed with the FAA on November 8, 2022, but not recorded.

(7)    Notice of Lien on Aircraft, dated July 7, 2020, executed by Launch Technical Workforce Solutions, LLC, as lienor, filed with the FAA on July 20, 2020, but not recorded.

(8)    Notice of Lien on Aircraft, dated February 9, 2024, executed by North State Aviation Holdings, LLC, as lienor, recorded by the FAA on March 4, 2024 and assigned conveyance number LJ030505.

(9)    Supplemental Notice of Lien on Aircraft, dated February 9, 2024, executed by North State Aviation Holdings, LLC, as lienor recorded by the FAA on March 4, 2024, and assigned conveyance number LJ030506.

(10)   Notice of Lien on Aircraft, dated July 7, 2020, executed by Launch Technical Workforce Solutions LLC, as lienor, filed with the FAA on July 20, 2020, but not recorded

(11)   Mechanic's Lien, dated October 4, 2022, executed by Sky Capital Partners Inc, as claimant, filed with the FAA on October 12, 2022, but not recorded.

(12)   Mechanic's Lien, dated November 4, 2022, executed by Sky Capital Partners Inc, as claimant, recorded by the FAA on April 5, 2023, and assigned conveyance number WV009503.

(13)   Verified Claim of Lien, dated July 11, 2023, executed by AvFuel Corporation, as claimant, recorded by the FAA on August 20, 2023, and assigned conveyance number GR011076.

(14)   Mechanic's Lien, filed with the FAA on October 25, 2022, executed by Sky Capital Partners Inc, as claimant, but not yet recorded.

(15)   Notice of Lien on Aircraft, dated February 9, 2024, executed by North State Aviation Holdings, LLC, as lienor, recorded by the FAA on March 6, 2024, and assigned conveyance number TP006795.

(16)   Supplement Notice of Lien on Aircraft, dated February 9, 2024, executed by North State Aviation Holdings, LLC, as lienor, recorded by the FAA on March 6, 2024, and assigned conveyance number TP006796.

(17)   Verified Claim of Lien, dated July 12, 2023, executed by AvFuel Corporation, as claimant, recorded by the FAA on August 20, 2023, and assigned conveyance number GR011074.

(18)   Mechanic's Lien, filed with the FAA on November 28, 2022, executed by Sky Capital Partners Inc, as claimant, but not recorded.

(19)   Mechanic's or Materialman's Lien Statement, dated August 2, 2023, executed by World Fuel Services, Inc., recorded by the FAA on September 13, 2023, and assigned conveyance number LT033281.

(20)   Amendment No. 2 to the FAA Aircraft Mortgage, dated as of September 15, 2023, between Aersale USA 1 LLC, as mortgagor, and Wells Fargo Bank, National Association, as agent, with a copy of Amendment No. 1 to the FAA Aircraft Mortgage, dated as of April 26, 2021, between Aersale USA 1 LLC, as mortgagor, and Wells Fargo Bank, National Association, as agent, attached, filed as one instrument with the FAA on September 15, 2023, but not recorded.

(21)     Engine Lease Agreement, dated as of December 21, 2020, between AWL Leasing I, LLC, as lessor, and Swift Air, LLC d/b/a IAero Airways, as lessee, recorded by the FAA on October 18, 2022 and assigned conveyance number TP003471.

**Additional Assets**

- Raytheon Aircraft Company model Hawker 800XP, MSN 258638, Honeywell International Inc. model TFE-731-5BR-1H Engines ESNs P107825 and P107826 together with all components, accessories, systems, appliances, parts, instruments, and furnishings, in each case owned by and in the possession of Seller.
- All records owned by Seller and identified in the ARMS System[1] with all records for aircraft, engines, APU's, Landing Gear and all other associated assets, in each case owned by and in the possession of Seller.
- All documents[2] owned by and in the possession of Seller related to work being completed on the aircraft, status of work done, work to be done, amount paid and outstanding exposure for completion and identified dates for completion.
- Records in the possession of Seller for all aircraft, engines, APUs, landing gear, inventory at all locations, and all other associated and related assets.
- All parts, inventory, equipment including hard time items, landing gear, slides, flashlights, and all other safety equipment with each aircraft, in each case that is owned by Seller.
- All off-wing APUs, engines, respective stands for all equipment, in each case that is owned by Seller.
- All landing gear inventory not installed, tooling, documents and records for the Hawker, in each case that is owned by Seller and, in the case of documents and records that is owned by and in the possession of Seller.
- All log books and related documents for each aircraft, in each case that is owned by and in the possession of Seller.
- All equipment, including but not limited to, pushback vehicles, belt loaders, tugs, tow bars, automobiles, lifts, tooling, calibrated tooling, air start machines, ground power units, and related equipment, in each case that is owned by Seller.
- All electronic equipment, including computers, electronic devices, EFBs, printers, servers, with all codes and access detail, in each case that is owned by Seller and the case of codes and access detail is known to Seller; provided, however, that all data on any such electronic equipment is an Excluded Asset except if it relates solely to the Purchased Assets. Seller shall cooperate with Buyer to transfer any data related solely to the Purchased Assets to Buyer and Buyer shall cooperate with Seller to transfer all other data to Seller; disclosure of any such data, whether inadvertent or otherwise, is not intended to waive privilege or confidentiality.
- All programs and system and training equipment, in each case that is owned, freely transferable by and in the possession of Seller.

---

[1] The ARMS system is not owned by Seller. It is licensed software and Buyer will need to obtain its own license.

[2] Reference to "documents" and "records" throughout this Schedule 2 includes all documents and all records whether in paper or electronic form, in each case solely to the extent owned by and in the possession of Seller.